# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| NATIONAL MARINE FISHERIES SERVICE, *et al.*, | ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 12-cv-0938 (KBJ)

## <u>MEMORANDUM OPINION</u>

The federal government has been gravely concerned about the depletion of fish in the waterways off the coast of the United States as a result of fishing activity since at least the mid-1970s, when Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act.  Pub. L. No. 94-265, 90 Stat. 352 (1976) (codified as amended at 16 U.S.C. § 1801 *et seq.* (2012)).  The Magnuson-Stevens Act seeks to "promote domestic commercial and recreational fishing" while employing "sound conservation and management principles" in order to ensure "the optimum yield from each fishery." *Id.* § 1801(b)(3)-(4).  The instant case arises from an attempt by the National Marine Fisheries Service ("NMFS") to pursue the twin aims of the Magnuson-Stevens Act in relation to the speckled hind and the warsaw grouper—two species of fish that live in the deep waters of the Atlantic Ocean and that are especially vulnerable to being "subjected to a level of fishing mortality" that threatens the capacity of each stock to replenish its population levels.  50 C.F.R. § 600.310(e)(2)(i)(B) (describing this phenomenon and labeling it "overfishing").

In December of 2010, the NMFS promulgated a regulation that banned outright the catching and retention of speckled hind and warsaw grouper, which had been listed as undergoing overfishing since 1997. In addition, because scientific research suggested that these particular stocks of fish would nevertheless continue to be endangered as a result of their accidental or incidental catch when fishermen in the region targeted *other* deep water species (a circumstance known as "bycatch"), the NMFS also prohibited the targeting of six other species of fish that the NMFS then believed "co-occurred" (*i.e.*, lived) with the speckled hind and the warsaw grouper in certain deep water areas of the South Atlantic Snapper-Grouper Fishery. In May of 2012, the NMFS reconsidered its co-occurrence findings and reversed course, enacting Regulatory Amendment 11, which lifted the prohibition related to the targeting of the six other deep water stocks. Plaintiffs Natural Resources Defense Council and Ocean Conservancy ("Plaintiffs")—nonprofit environmental protection organizations that strenuously object to the NMFS's change in policy—have filed this action against the NMFS, the National Oceanic and Atmospheric Administration ("NOAA"), the Department of Commerce, and the Secretary of the Department of Commerce (collectively, "Defendants") to challenge Regulatory Amendment 11 on the grounds that it violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, as well as the Magnuson-Stevens Act itself.

Before this Court at present are the parties' cross motions for summary judgment. Plaintiffs assert that the undisputed administrative record establishes that the NMFS lifted the six-stock deep water prohibition largely due to pressure from fishing communities that stood to profit greatly if fishing for the six other species was

permitted once again; thus, according to Plaintiffs, Regulatory Amendment 11 was arbitrary and improper.  Defendants maintain that, although economic considerations did factor into the agency's decision, NMFS's primary reason for lifting the prohibition was its reasonable and well-supported determination that because the six stocks of fish do not, in fact, co-occur with speckled hind and warsaw grouper, the six-stock deep water prohibition was an ineffective conservation measure.

On September 30, 2014, this Court issued an Order announcing that Plaintiffs' motion for summary judgment is **DENIED** and Defendants' cross-motion for summary judgment is **GRANTED**.  (Order, ECF No. 46.)  In the instant Memorandum Opinion, the Court explains the reasoning behind that ruling.  In short, after reviewing the record and the parties' submissions and hearing oral argument on the motions, this Court has determined that the NMFS adopted Regulatory Amendment 11 based on a reasonable analysis of the available data and that the agency sufficiently explained its change in policy.  Moreover, it is clear to this Court that the NMFS's conclusion that the six-stock deep water prohibition should be repealed is not inconsistent with the tenets of the Magnuson-Stevens Act.

## I.      BACKGROUND

Plaintiffs' challenge to Regulatory Amendment 11 arises out of the "complicated statutory and regulatory system governing [] federal fisheries." *Lovgren v. Locke*, 701 F.3d 5, 13 (1st Cir. 2012).[1]  A brief description of the federal fishery management scheme is warranted, because a basic understanding of the applicable laws and

---

[1] A "fishery" is a term that has many applications, but in the context of this opinion, it describes an off-shore nautical area that certain stocks of fish populate and that is the subject of specified government policies that restrict and manage fishing activities.

regulations—and, in particular, *how* such federal restrictions on fishing activity are developed and adopted—is necessary for full comprehension of the NMFS action that is being challenged here.

### A.     The Federal Fishery Management System

Congress enacted the Magnuson-Stevens Act in 1976 to address the combination of increased fishing activity in certain coastal areas (known as "fishing pressure"), habitat losses, and inadequate conservation and management practices that threatened the survival of certain stocks of fish. *See* 16 U.S.C. § 1801(a)(2).[2] When it amended the Magnuson-Stevens Act in 2006, Congress reiterated its intent to continue to "conserve and manage [U.S.] fishery resources," and to "promote domestic commercial and recreational fishing under sound conservation and management principles." *Id.* § 1801(b)(1)-(3); *see also NRDC v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 879 (9th Cir. 2005) ("The Act sets this priority in part because the longer-term economic interests of fishing communities are aligned with the conservation goals set forth in the Act. Without immediate efforts at rebuilding depleted fisheries, the very long-term survival of those fishing communities is in doubt.") (citations omitted).[3]

---

[2] The term "stock" refers generically to a "species, subspecies, geographical grouping, or other category of fish capable of management as a unit." 16 U.S.C.A. § 1802(42). Fish grouped into a stock may share a genetic relationship, geographic distribution, or movement patterns. *See generally* Henry E. Booke, *The Conundrum of the Stock Concept—Are Nature and Nurture Definable in Fishery Science?*, 12 Can. J. Fisheries & Aquatic Sci., 1479 (1981).

[3] Congress's revisions to the Magnuson-Stevens Act have trended toward stronger conservation efforts. In the years after the passage of the original statute, fishery depletion continued and economic exploitation largely prevailed over resource conservation. *See* 142 Cong. Rec. H11418, 11439 (Sept. 27, 1996) (statement of Rep. Studds) ("Despite numerous efforts to improve the law over the past two decades, the sad reality [was] that the act did not prevent the current crisis . . . for the conservation of both fish stocks and fishing families[.]"). The Act was revised in 1996 "to give conservation of fisheries priority over short-term economic interests." *NRDC v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 879 (9th Cir. 2005) (citing *NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000)); *see also* 142 Cong. Rec. S10794, 10811–12 (Sept. 18, 1996) (statement of Sen. Kerry) (stating that the revisions to

To accomplish these goals, the Magnuson-Stevens Act defined a federal fisheries conservation zone that extends between three nautical miles and two hundred nautical miles off the coast of the United States. Within this zone, federal authorities administer a fishing conservation and management program designed to prevent overfishing and to rebuild depleted stocks. This conservation and management program is developed through the cooperation of local, state, and federal government officials, and also other major stakeholders, including members of the commercial and recreational fishing industries and environmental and consumer organizations. *Id.* §§ 1801(b)(5); *id.* § 1852(b)(1)-(2). Because members of Congress tended to believe that "[t]he demise of the United States fisheries in the past is more accurately attributable to *non*management rather than to *mis*management," the Magnuson-Stevens Act was specifically designed to offer the federal government "the tools for truly effective management" of the fishing activity in our nation's coastal waters. Warren G. Magnuson, *The Fishery Conservation and Management Act of 1976: First Step toward Improved Management of Marine Fisheries*, 52 Wash. L. Rev. 427, 428 (1976-1977) (emphasis added).

Under the Magnuson-Stevens Act, Congress has designated the Secretary of Commerce as the manager of the fishery conservation and management program but in practice, the Secretary delegates his authority to the NMFS, which is a sub-agency of the NOAA within the Department of Commerce. *See N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 70-71 (D.D.C. 2007); *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 43 n.2 (D.D.C. 2012); *Fishermen's Finest v. Locke*, 593 F.3d 886, 889 (9th Cir. 2010). In

---

the Magnuson-Stevens Act were critical in order to "put our fisheries back onto a sustainable path and literally avert an environmental catastrophe on a national level" and that "[w]e are precariously close to fisheries failures in many of our most commercially important fish stocks, and it is imperative that we take immediate action if we are to avert disasters").

its role as the manager of the fisheries in America's coastal waters, the NMFS has a number of tools at its disposal.

       1.     <u>Regional Fishery Management Councils And Fishery Management Plans</u>

The NMFS's most important resource under the Magnuson-Stevens Act is eight "Regional Fishery Management Councils."  The Fishery Management Councils are boards that are meant to "reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority."  16 U.S.C. at § 1852(a)(2).  Accordingly, the Act requires the Secretary to appoint individuals to the Regional Fishery Management Councils who "by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned."  *Id*. § 1852(b)(2)(A).  To meet the goal of broad-based participation by relevant stakeholders, the councils' membership is drawn from the commercial and recreational fishing industries, and also environmental and consumer organizations, in addition to local, state, and federal officials.  *Id.* §§ 1801(b)(5), 1852(b)(1)-(2).

The most significant responsibility of the Fishery Management Councils under the Magnuson-Stevens Act is the drafting of "Fishery Management Plans."  *Id.* § 1852(h)(1).  Fishery Management Plans include data analyses and management measures for a fishery.  Essentially they are recommendations to the Secretary of Commerce on the allocation of resources: the plans describe the environmental and economic status of the fishery and propose conservation and management measures that are "necessary and appropriate for the conservation and management of the fishery, to

prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id*. § 1853(a)(1)(A). "The ultimate goal [ ] of any [F]ishery [M]anagement [P]lan is to establish measures which achieve a rate or level of fishing mortality that allows the fishery to produce the maximum sustainable yield on a continuing basis." *A.M.L. Int'l, Inc. v. Daley*, 107 F. Supp. 2d 90, 93 (D. Mass. 2000) (citing 16 U.S.C. § 1802(29); 50 C.F.R. § 600.310(a)). In other words, Fishery Management Plans set the fishing activity rules for the fishery; if the fishery is overfished, the Fishery Management Plan will limit fishing in a way that allows the fishery to rebuild affected stocks of fish. *See* 16 U.S.C. § 1854(e)(2).

The Magnuson-Stevens Act mandates that the Regional Fishery Management Councils employ a variety of mechanisms to gather information when developing and updating Fishery Management Plans. Among other things, the Magnuson-Stevens Act instructs Fishery Management Councils to draw on the expertise of "Advisory Panels," which are committees that are meant to represent all those people with a direct interest in the fishery, ranging from environmentalists, to sport fishermen, to members of the fishing industry. *Id*. §§ 1852(g)(2), 1852(g)(3)(B). Furthermore, under the Magnuson-Stevens Act, Fishery Management Councils are required to establish and maintain a Scientific and Statistical Committee ("SSC") in order "to assist [the council] in the development, collection, evaluation, and peer review of such statistical, biological, economic, social, and other scientific information as is relevant to such Council's development and amendment of any fishery management plan." *Id*. § 1852(g)(1)(A). In addition to hearing from these experts, Fishery Management Councils must also conduct public hearings "to allow all interested persons an opportunity to be heard in the

development of fishery management plans and amendments to such plans, and with respect to the administration and implementation of the [Magnuson-Stevens Act]." *Id.* § 1852(h)(3).

2.    The NMFS's Rulemaking Process

Once a Fishery Management Council finishes drafting a proposed Fishery Management Plan in consultation with its expert and lay advisors, the Council submits the proposal to the NMFS. *Id.* § 1852(h)(l); *Flaherty*, 850 F. Supp. 2d at 43. The NMFS, through the Secretary of Commerce, is responsible for the adoption and implementation of the Fishery Management Plans as well as any amendments to such plans. 16 U.S.C. § 1855(d) ("The Secretary shall have general responsibility to carry out any [F]ishery [M]anagement [P]lan or [A]mendment approved or prepared by him, in accordance with the provisions of this chapter.").[4] Upon receiving a Fishery Management Plan, the NMFS must "immediately" publish notice in the Federal Register soliciting comments on the Plan, *see id* § 1854(a)(1)(B), and also must "immediately" review the Plan to determine whether it conforms to the standards set forth in the Magnuson-Stevens Act and any other applicable statute, *see id*. § 1854(a)(1)(A).

With respect to ensuring compliance with the Magnuson-Stevens Act's standards, the NMFS generally determines whether a Fishery Management Plan includes conservation and management measures that are "necessary and appropriate . . . to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(l)(A).

_____

[4] The Magnuson-Stevens Act empowers the Secretary not only to adopt the Plans submitted by the Council, but also to prepare Fishery Management Plans without the input of the Regional Fishery Management Council, if the Council fails to develop and submit a Plan, or if the Secretary disapproves of the Plan submitted. 16 U.S.C § 1854(c).

Furthermore, the NMFS is tasked with the responsibility of verifying that the Fishery Management Plan satisfies the ten "national standards for fishery conservation and management" (hereinafter, "National Standards") that the Magnuson-Stevens Act establishes. *See id.* § 1851(a). The National Standards mandate that Fishery Management Plans conform to certain enumerated ideals, including the following four principles:

> (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.
>
> (2) Conservation and management shall be based upon the best scientific information available. . . .
>
> (8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the preventing of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities . . . in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.
>
> (9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

*Id*.

Significantly for present purposes, National Standard Eight (quoted above) requires the NMFS to "focus on the welfare of fishing communities," such that "where two alternatives in fact achieve similar conservation goals, the preferred option will be the alternative that provides the greater potential for sustained participation of fishing communities and that minimizes adverse economic impacts." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 72, 92. However, National Standard Nine tempers the potentially negative impact on conservation efforts of

considering the economic interests of the fishing community by addressing "bycatch"—i.e., the accidental or incidental catching of species that are "harvested in a fishery, but which are not sold or kept for personal use" 16 U.S.C. § 1802(2)—and specifically requires that Fishery Management Plans adopt measures that minimize bycatch "to the extent practicable." *Id.* § 1851(a)(9).

Notably, although the Magnuson-Stevens Act's National Standards do constitute statutory requirements upon which legal action can be based, "[t]he National Standards do not require any particular outcome with respect to allocations; rather, they provide a framework for the Council's analysis." *Fishermen's Finest*, 593 F.3d at 896. Put another way, the National Standards are broadly worded statements of Congressional objectives for all fishery conservation and management measures, and the NMFS is "required [ ] to exercise discretion and judgment in balancing" these sometimes conflicting concerns. *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996).

In addition to policing Fishery Management Plans for compliance with the National Standards, the NMFS is also responsible for enforcing other requirements of the Magnuson-Stevens Act with respect to certain specific provisions that, per the statute, must be included in Fishery Management Plans and Amendments. One such provision is particularly relevant to the instant dispute: it obliges all Fishery Management Plans and Amendments to specify "annual catch limits," 50 C.F.R. § 600.310(b)(2)(iii), which are caps on the "level of annual catch of a [particular] stock or stock complex," *id.* § 600.310(f)(2)(iv). An acceptable annual catch limit provision

includes both (1) the permissible catch amount for each stock, and (2) "accountability measures"—a term of art that refers to mechanisms for ensuring that the annual catch limit is not exceeded. 50 C.F.R. § 600.310(f)(2)(iv); *id.* § 600.310(g)(1). Catch limits and accountability measures are required in Fishery Management Plans in order to promote the "optimum yield" from a fishery; that is, the amount of fishing that will provide the "greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems[.]" 16 U.S.C. § 1802(33)(A). As explained, the Council is required to include annual catch limits and accountability measures in their Fishery Management Plans, and it is the NMFS's duty to ensure that such plans "implement[ ] regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." *Id.* § 1853(a)(15).

During the NMFS's review of any Fishery Management Plan for statutory compliance, the NMFS must "take into account the information, views, and comments received from interested persons." *Id.* § 1854(a)(2)(A). Within thirty days of the end of the public comment period, the Secretary must "approve, disapprove, or partially approve" the Fishery Management Plan. 16 U.S.C. § 1854(a)(3). If the NMFS disapproves of the Plan, it must send a "written notice to the Council," specifying "(A) the applicable law with which the plan or amendment is inconsistent; (B) the nature of such inconsistencies; and (C) recommendations concerning the actions that could be taken by the Council to conform such [P]lan or [A]mendment to the requirements of applicable law." *Id.* Conversely, if the NMFS approves of the Plan, the Magnuson-Stevens Act directs the NMFS to implement the Plan through the promulgation of

regulations consistent with the Plan.  *Id*. § 1855(d).  The Council may also propose and submit language for regulations implementing the Fishery Management Plan along with the Plan itself, in which case, the NMFS will review the proposed regulations for consistency with the Plan and publish those proposed regulations for notice-and-comment before promulgating final regulations.  *Id*. § 1854(b)(1).

It is only after the NMFS promulgates regulations implementing a Fishery Management Plan that the Plan becomes binding on the fishery.  That is, the Fishery Management Plans and Amendments that the Regional Fishery Management Councils prepare do not themselves carry the force of law and cannot be challenged until the NMFS enacts regulations to effectuate the proposals.  *See N.C. Fisheries Ass'n* v. *Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008).  The actions of the NMFS in promulgating regulations to adopt a Fishery Management Plan are subject to judicial review under the APA.  *See id.*

3.     Amendments To Fishery Management Plans

"Once [a Fishery Management Plan] has been approved and implemented, continuing management of the subject fishery involves monitoring the fishery, evaluating new information, and adjusting the management program through changes to the [Fishery Management Plan] and/or to its implementing regulations." *See* EPA, Office of Federal Activities, *Final Guidance for Reviewing Environmental Impact Statements for Fishery Management Plans* ("EPA Guidance Document"), TO-0008 for contract 68-W-03-029 (Sept. 2005), at 14.  Fishery Management Plans themselves are amended through a process called "formal amendment," while the regulations that implement such plans are altered through the "regulatory amendment" process.  *Id*. at 14, 17.  Regulatory amendments "must follow normal rulemaking procedures," but take

12

less time to implement than Formal Amendments and are more easily modified. *Id.* at 17; *see also N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 73 (contrasting "plan amendments" with "more streamlined regulatory amendments"). Notably, "[a] regulatory amendment may [also] be used to implement a portion of an approved [Fishery Management Plan] or Amendment that was reserved" by the NMFS at the time the Plan or Amendment was adopted. EPA Guidance Document at 17; *see also id.* ("A regulatory amendment offers considerable time savings over [a Formal] Amendment because future regulatory changes are anticipated within the scope of the [Fishery Management Plan].").

The instant case involves both a formal amendment and a regulatory amendment to the South Atlantic Snapper-Grouper Fishery Management Plan.

## B.    The South Atlantic Snapper-Grouper Fishery

The South Atlantic Snapper-Grouper Fishery (the "Fishery") is an area "off the coasts of North Carolina, South Carolina, Georgia, and Florida through the Atlantic side of Key West." (S. Atl. Fishery Mgmt. Council, Regulatory Amendment 11 to the Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (2011) ("RA 11"), AR Doc. 86 at 2958).[5] Access to this Fishery "had been open and virtually unlimited prior to 1983," but "conservation measures have vastly increased" during the last three decades, *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 74; these measures have

---

[5] References to the administrative record compiled for Regulatory Amendment 11 will be referred to throughout as "AR Doc. __." By contrast, the citation "17B AR Doc. ___" refers to the administrative record for Amendment 17B, excerpts of which the parties filed subsequent to briefing the instant cross-motions for summary judgment regarding Regulatory Amendment 11. (*See* Supplement to the Admin. R., ECF No. 39.) For both records, the document title as listed in the joint appendix table of contents, document number, and bates number, will be provided the first time the document is cited. (*See* Admin. R. Joint Appendix, ECF No. 40.)

primarily been adopted and implemented under the Magnuson-Stevens Act, as described above, in the context of the South Atlantic Snapper-Grouper Fishery Management Plan.

Generally speaking, the primary aim of the various conservation restrictions that are in effect in this region is to protect and manage the sixty species of snapper and grouper that make up the Fishery, including eight "deep water" stocks relevant to this dispute: speckled hind, warsaw grouper, blueline tilefish, snowy grouper, yellowedge grouper, misty grouper, queen snapper, and silk snapper. *See* Comprehensive Annual Catch Limit Am. for the South Atl., 77 Fed. Reg. 15,916 (Mar. 16, 2012). Although these eight stocks carry the deep water label, several of them can also be found in shallower waters. (RA 11, AR Doc. 86 at 2957, 2996.)

Commercial and recreational fisherman seek (i.e., "target") each of these eight species in the Fishery to a different degree. The species that is targeted most—by far— is the blueline tilefish, followed by the snowy grouper. (*Id.* at 2980-82; Amendment 17B Final Rule, 75 Fed. Reg. 82,280 (Dec.30, 2010) ("17B Final Rule"), AR Doc. 5 at 45-46.) These two stocks often co-occur, meaning that they live in the same habitat within the Fishery and are typically found together. (17B Final Rule, AR Doc. 5 at 46; RA 11, AR Doc. 86 at 2957, 2967, 2996.)[6] Yellowedge grouper, misty grouper, queen snapper, and silk snapper are not targeted at all, and these species are rarely encountered. (Mem. from Roy E. Crabtree, to Samuel D. Rauch III (Apr. 23, 2012) ("Apr. 2012 Crabtree Mem."), AR Doc. 192 at 6100; Regulatory Amendment 11 Final Rule ("RA 11 Final Rule"), 77 Fed. Reg. 27,374 (May 10, 2012), AR Doc. 196 at 6115;

---

[6] Fishermen tend not to target snowy grouper on its own. Rather, snowy grouper is usually caught only incidentally when fishermen are targeting blueline tilefish. (S. Atl. Fishery Mgmt. Council Snapper Grouper Comm., Summ. Minutes (June 14-15, 2011) ("June 2011 Minutes"), AR Doc. 48 at 1736.)

Final Appendices to Regulatory Amendment 11 ("Final App. to RA 11"), AR Doc. 87 at 3078; S. Atl. Fishery Mgmt. Council, Amendment 17B to the Fishery Managment Plan for the Snapper-Grouper Fishery of the South Atlantic Region (2010) ("Am. 17B Envtl. Assessment"), 17B AR Doc. 195 at 14019-14020.)

The remaining two species—speckled hind and warsaw grouper—are the subject of the NMFS action being challenged in this case. Speckled hind and warsaw grouper are both large, deep water grouper species that dwell in reefs and rocky hard-bottom habitats along the South Atlantic seaboard. (RA 11, AR Doc. 86 at 2968-69.) Speckled hind can grow up to four feet long and can weigh over sixty-five pounds. (*Id*. at 2968.) Warsaw grouper are even larger than speckled hind; they can grow up to seven feet long and can weigh more than 500 pounds. (*Id.* at 2969.)

Because of certain aspects of their biology and their mating habits, both speckled hind and warsaw grouper are especially vulnerable to overfishing. First of all, both species are protogynous hermaphrodites, which means that they change sex from female to male as they grow and sexually mature. (17B Final Rule, AR Doc. 5 at 44; AR Doc. 86 at 2959.) Speckled hind are believed to reach sexual maturity after seven years, and can live as long as thirty-five years. (Gabriel L. Ziskin *et al.*, *Indications of Continued Overexploitation of Speckled Hind Along the Atl. Coast of the S.E. U.S.*, 140 Transactions of the Am. Fisheries Soc'y 384 (2011) ("Ziskin Study"), AR Doc. 16 at 294-95.) Warsaw grouper reach sexual maturity after approximately nine years and can live to be as much as forty-one years old. (Natural Res. Def. Council, Ocean Conservancy, and Pew Envtl. Grp., Comments on Request for Secretarial Disapproval

of Regulatory Amendment 11 (Jan. 19, 2012) ("Comments on Request for Disapproval"), Ex. B, AR Doc. 203 at 6302.)

Second, speckled hind and warsaw grouper are "ontogenetic migrat[ing]" species, which means that they move from shallower to deeper water as they age. (S. Atl. Fishery Mgmt. Council, Snapper Grouper Comm., Summary Minutes (June 14-15, 2011) ("June 2011 Minutes"), AR Doc. 48 at 1726; Final App. to RA 11, AR Doc. 87 at 3057-58.)[7] According to the NMFS's analysis of data regarding distribution and catch information, a significant population of both speckled hind and warsaw grouper has been observed in shallower waters. (March 23, 2012 Presentation Speckled Hind & Warsaw Grouper: A Review of Available Distribution and Catch Data ("March Presentation"), AR Doc. 127 at 4854-55.) However, the older fish are found in deeper waters; thus, deep water fishing disproportionately affects the grown, male fish, "reduc[ing] spawning potential in the population." (Ziskin Study, AR Doc. 16 at 394.) Deep water fishing also has the potential to harm large numbers of the grown male fish because speckled hind and warsaw grouper spawn in groups, known as "spawning aggregations." (RA 11, AR Doc. 86 at 2968.) This spawning aggregation behavior increases the likelihood that deep water fishermen may catch large groups of grown, male, breeding-capable fish faster than the stock can reproduce. (*Id.*; Comments on Request for Disapproval, AR Doc. 203 at 6302, 6320; Am. 17B Envtl. Assessment, 17B AR Doc. 195 at 13,890.)

---

[7] Speckled hind inhabit waters with depths ranging from 98 to 1,312 feet, but are most commonly found between 196 and 394 feet. (RA 11, AR Doc. 86. at 2968.) Warsaw grouper are found at water depths ranging from 180 to 1,722 feet, with juveniles observed in shallower waters. (*Id.* at 2969.)

Finally, some scientists maintain that speckled hind and warsaw grouper experience "catastrophic decompression syndrome," also known as "barotrauma," a phenomenon in which the rapid change in pressure that occurs when a fish is dragged to the sea surface in a fishing net destroys the fish's vital organs. (Ziskin Study, AR Doc. 16 at 298.) This means that, when these fish are caught in deeper waters—and, again, the speckled hind and warsaw grouper in deeper waters are generally the adult, male, spawning members of the population—they are more likely to die as a result of being caught, even if they are immediately released. (Am. 17B Envtl. Assessment, 17B AR Doc. 195 at 14,019.) [8]

Perhaps due to their unique biological traits, both the speckled hind and the warsaw grouper have been subjected to overfishing in the South-Atlantic Snapper-Grouper Fishery for nearly the past two decades. (*See* RA 11, AR Doc. 86 at 2959, 2993.) Scientists at the NMFS have studied the chronic overfishing problem with respect to these two species, and have found that, in addition to the obvious threat that is posed by direct targeting, a major unchecked source of the overfishing problem is incidental bycatch mortality. (*See* Ziskin Study, AR Doc. 16 at 294-95, 298; Ex. J. to Comments on Request for Disapproval, AR Doc. 203 at 6379, 6389.) That is to say, as of 2011, marine scientists have theorized that one reason for the observable decrease in the speckled hind and warsaw grouper populations was the fact that groups of mature,

---

[8] There is some uncertainty regarding whether speckled hind and warsaw grouper do, in fact, experience a high rate of barotrauma because, to date, there have not been any catastrophic decompression syndrome studies that specifically pertain to the relationship between depth and bycatch release mortality for speckled hind and warsaw grouper. The scientists who believe that the data supports the high risk of barotrauma with respect to the speckled hind and warsaw grouper have inferred as much based on studies of other snapper-grouper species. (*See* Am. 17B Envtl. Assessment, 17B AR Doc. 195 at 14019; *see also*, *e.g.*, March Presentation AR Doc. 127 at 4853 (noting that studies of gag grouper reveal bycatch mortality rates of 50 percent when fish are caught at 150 feet and 80 percent when caught at 240 feet).)

male speckled hind and warsaw grouper were being accidentally caught during fishing trips that target co-occurring species, and were being killed as a result of barotrauma even if they were released back into the water. (*See* Ziskin Study, AR Doc. 16 at 298-99; *see also* Pls.' Opp'n to Defs.' Mot. for Summ. J. & Reply in Supp. of Pls.' Mot. for Summ. J., ECF No. 36 ("Pls.' Reply") at 7 (summarizing the problem as the concern that "[b]ycatch in deep water is more likely to kill [these] fish than in shallow water, and it alters the species' male-female ratio and selectively kills the sexually mature members of the species.").) As explained below, the NMFS recently took the lead in addressing this overfishing concern through its promulgation—and subsequent repeal—of various conservation measures.

### C. Amendment 17B

In 2010, the South Atlantic Snapper-Grouper Fishery Management Council convened to consider the plight of the speckled hind and warsaw grouper, and it ultimately proposed to the NMFS that the agency adopt Amendment 17B to the Snapper-Grouper Fishery Management Plan. Among other things, this formal amendment established an annual catch limit of zero for these two species. (Am. 17B Envtl. Assessment, 17B AR Doc. 195 at 14,018, 14,047.) Amendment 17B also implemented an accountability measure to ensure that the annual catch limit was met: it prohibited any and all harvest and possession of speckled hind or warsaw grouper throughout the South Atlantic, meaning that fishermen could not retain and bring to shore even a single speckled hind or warsaw grouper. (RA 11 Final Rule, AR Doc. 196 at 6115; Am. 17B Envtl. Assessment, 17B AR Doc. 195 at 14,018.) Despite these sweeping provisions, the Council concluded that prohibiting harvest and catch alone did not address the serious problem of bycatch mortality, and that other measures were

needed to prevent overfishing.  (17B Final Rule, AR Doc. 5 at 54 (noting that restrictions on landed catch alone "would not be sufficient to end overfishing of speckled hind and warsaw grouper due to discard mortality from fishing for other co-occurring deepwater species"); *id.* at 45 (noting that speckled hind and warsaw grouper are long-lived and slow growing and require more stringent management measures, such as area closures, to end overfishing); RA 11, AR Doc. 86 at 2959; Am. 17B Envtl. Assessment, 17B AR Doc. 195 at 14,022.)

To address the bycatch problem, the Council included in Amendment 17B the contested provision at the heart of this dispute:  a prohibition on the harvest and possession of six other snapper-grouper stocks in the fishery (blueline tilefish, snowy grouper, yellowedge grouper, misty grouper, queen snapper, and silk snapper) that were thought to co-occur with speckled hind and warsaw grouper in depths of 240 feet or greater—the depth at which bycatch mortality of speckled hind and warsaw grouper due to barotrauma was believed to be high.  (Mem. from Roy E. Crabtree, Ph.D., to Eric C. Schwaab (Dec. 20, 2010) ("Dec. 2010 Crabtree Mem."), 17B AR Doc. 228 at 14,477; 17B Final Rule, AR Doc. 5 at 43-44; RA 11, AR Doc. 86 at 2959.)  Significantly, this six-stock deep water prohibition was not an complete closure of fishing waters, but instead was limited in two respects.  First, the prohibition was limited to waters greater than 240 feet in depth; according to the Council, prohibiting harvest of co-occurring snapper-grouper species in such deep water "would provide protection to the largest, most fecund fish and ensure a natural sex ratio into the future."  (Am. 17B Envtl. Assessment, 17B AR Doc. 195 at 13,890.)  Second, the prohibition was limited in scope:  Amendment 17B only "[p]rohibit[ed] the harvest and possession of [the] species

that are most often caught with speckled hind and warsaw grouper in deeper waters[,]" leaving the same waters open to fishing that targeted other snapper-grouper stocks that were not believed to co-occur with these two species. (17B Final Rule, AR Doc. 5 at 44.) (emphasis added).[9]

Although the Council eventually reached a consensus that the limited prohibition (referred to herein as "the six-stock deep water prohibition" or "the closure") was the proper path, there was substantial internal opposition. The Council ultimately passed Amendment 17B at a December 2009 meeting with eight members in favor of the closure and five members dissenting. (*See* Mem. from Duane Harris to Dr. Roy Crabtree (Mar. 30, 2010) ("Harris Mem."), 17B AR Doc. 193 at 13,829.) In March of 2010, the dissenting councilmembers submitted a report outlining their opposition to the six-stock deep water prohibition (the "minority report"), which lodged two main challenges to the Council's adoption of the Amendment 17B. (*See* Dec. 2010 Crabtree Mem., 17B AR Doc. 228 at 14,478.) First, the minority report challenged the "assumption" that speckled hind and warsaw grouper co-occur with the six listed species in numbers that are substantial enough to warrant the prohibition. (*Id.* at 14,479.) In this regard, the minority report most fervently objected to the alleged association of these two species with blueline tilefish. (*See id.* at 14,478 (pointing to newly available information that suggested that blueline tilefish can be harvested without incidental bycatch of speckled hind and warsaw grouper); *id.* at 14,479 (noting that speckled hind and warsaw grouper co-occur more frequently with species not included in the prohibition).) Second, the

---

[9] For example, the Council chose not to include golden tilefish in the prohibition based on data showing that they dwell in a mud habitats, whereas speckled hind and warsaw grouper prefer rocky, hard-bottom habitats. (17B Envtl. Assessment, 17B AR Doc. 195 at 1361-62, 14018-14021; Dec. 2010 Crabtree Mem., 17B AR Doc. 228 at 14478.)

minority report faulted the scientific basis for the six-stock deep water prohibition, contending that the majority had made an "inadequate assessment" of the data available regarding speckled hind and warsaw grouper, and that the available data itself was limited.  (*Id.* at 14,478-79.) [10]

After voting to approve Amendment 17B, including the controversial six-stock deep water prohibition, in December of 2009, the Council forwarded that Amendment to the NMFS for review and promulgation.  (*See* Harris Mem., 17B AR Doc. 193 at 13,829.)  Later that month, the NMFS promulgated a final rule implementing Amendment 17B, *see* 17B Final Rule, Amendment 17B, AR Doc. 5; 50 C.F.R. § 622; however, in recognition of the strong opposition from within the Council itself, the NMFS made clear that its "approval and implementation" of the six-stock deep water prohibition "does not preclude the Council from proposing future action to modify this prohibition if scientific information indicates it is appropriate to do so."  (17B Final Rule, AR Doc. 5 at 46; *see also id.*  (clarifying that "[r]e-addressing the deepwater closure will be accomplished through a regulatory amendment proposed by the Council at its December 2010 meeting").)

## D.    Regulatory Amendment 11

At the same time as the NMFS was undertaking final action on Amendment 17B, the Council commenced its own reevaluation of the need for the six-stock deep water prohibition.  As explained below, the Council's reevaluation process primarily involved

---

[10] For example, the NMFS's assessment that both species were undergoing overfishing was based on data from 1999 (for speckled hind) and 1990 (for warsaw grouper).  Since the last evaluations were conducted, the NMFS had taken action aimed toward ending overfishing of these stocks (*see* RA 11 Final Rule, AR Doc. 196 at 6116-19); consequently, the NMFS stated in the Final Rule for Regulatory Amendment 11 that the available data were "insufficient to assess the most recent fishing mortality rates" under the existing measures (*Id.* at 6116; *see also* Am.17B Envtl. Assessment, 17B AR Doc. 195 at 14,018 ("Assessment information is dated for both species.").)

commissioning a study of existing data regarding where speckled hind and warsaw grouper are most frequently caught and with which species they co-occur—a study that is referred to in this opinion as "the Catch Analysis." (Final App. to RA 11, AR Doc. 87 at 3041-43 (describing data sources).) This study prompted the Council to reverse its recommendation regarding the six-stock deep water prohibition and to propose that the NMFS adopt a regulatory amendment lifting that restriction. (*See, e.g.*, June 2011 Minutes, AR Doc. 48 at 1736-42; S. Atl. Fishery Mgmt. Council, Snapper Grouper Comm., Summary Minutes (Aug. 9, 2011) ("Aug. 2011 Minutes"), AR Doc. 66 at 2287-91.) Thus, mere months after the NMFS promulgated the prohibition by enacting Amendment 17B, the NMFS was faced with the decision of whether or not to reverse itself and do away with that regulatory provision. The NMFS's analysis of this question involved not only reviewing the Council's recommendation and Catch Analysis, but also conducting its own additional research, preparing an environmental assessment of the impact of lifting the prohibition, considering public comment on the matter, and forming its own conclusions regarding the propriety of adopting Regulatory Amendment 11.

> 1. The Council Commissioned The "Catch Analysis" And Considered Alternatives

The Council's decision to recommend repealing the six-stock deep water prohibition was principally based on a study that scientists at the NMFS conducted at the Council's request. The scientists assessed existing data regarding where speckled hind and warsaw grouper are, in fact, most frequently caught and with which species they co-occur. (Final App. to RA 11, AR Doc. 87 at 3041-58 (Catch Analysis).) The underlying data was collected during fishing trips from 1962 through 2010 (*id.* at 3041-

43), and although this data was available prior to the implementation of Amendment 17B and the deep water prohibition, the Council had not previously engaged in the type of detailed assessment that was done in the Catch Analysis. Specifically, the scientists conducted a "cluster analysis" of observations of speckled hind and warsaw grouper, and homed in on data regarding where fisherman caught speckled hind and warsaw grouper when fishing for the other six stocks included in the prohibition. (*Id.* at 3043.) The Catch Analysis showed that speckled hind and warsaw grouper are far more frequently found in shallow waters inshore of 240 feet (*id.* at 3048); however, it was acknowledged that this finding was due, in part, to the fact that most fishing occurs in shallower waters, so there is a much greater opportunity for the species to be observed in shallow areas. (*Id.* at 3046-47, 3056 (noting that the data "suffer[s] from biases for under-representation").) Despite the higher frequency in shallow waters, the NOAA scientist who authored the Catch Analysis concluded that "the *odds* of encountering speckled hind and warsaw grouper are higher outside of 240 [feet]." (*Id.* at 3048 (emphasis added).) In other words, "[t]he highest odds of encounters for these species are in waters greater than 240 feet, although the data sources, in terms of absolute numbers, are much more inside of 240 feet." (June 2011 Minutes, AR Doc. 48 at 1731.)

In addition to assessing the frequency and odds of encountering speckled hind and warsaw grouper, the Catch Analysis also assessed the probability of co-occurrence between those species and the other six stocks included in the deep water prohibition. (Final App. to RA 11, AR Doc. 87 at 3050-58.) The Catch Analysis indicated that speckled hind and warsaw grouper "rarely co-occurred" with any of the six stocks. (*Id.* at 3050.) In particular, the data indicated that blueline tilefish, snowy grouper, and

yellowedge grouper were "distinctly separated from speckled hind and warsaw grouper." (*Id.* at 3051.) Instead, speckled hind and warsaw grouper were more often found with stocks not included in the deep water prohibition. (*Id.* at 3050.) Zeroing in on the data behind blueline tilefish and snowy grouper, which are targeted most frequently in the fishery, the Catch Analysis attributed the low association of those species with speckled hind and warsaw grouper to habitat preferences: (1) whereas speckled hind and warsaw grouper prefer rocky hard-bottom habitats, blueline tilefish do not, and (2) snowy grouper are usually found in depths where speckled hind and warsaw grouper are not. (Final App. to RA 11, AR Doc. 87 at 3057.)

Significantly, when the Council reviewed the Catch Analysis, it specifically recognized that the lower number of fishing trips in deep water meant that there was a more limited opportunity to ascertain the location of speckled hind and warsaw grouper at those depths and, more importantly, to test their co-occurrence with the other stocks in those waters. (*See* June 2011 Minutes, AR Doc. 48 at 1725-28, 1731-32 (repeatedly noting biases in the data).) Primarily because of this relative absence of information about fishing trips in the deep water area, there was some opposition to lifting the prohibition among members of the Council who believed that no protections should be removed without more information about speckled hind and warsaw grouper in the greater depths. (*See, e.g.*, *id.* at 1725-28, 1731-32, 1738-40 (noting data limitations, expressing reservations about lifting the closure, and discussing alternatives).)

In an effort to balance the need for conservation measures to protect the speckled hind and warsaw grouper with the concern about being overly restrictive of fishing, the Council also considered nine alternatives to lifting the six-stock deep water prohibition

in its entirety, including options that would have exempted either certain areas or certain species from the ban. (RA 11, AR Doc. 86 at 2989-3004.)[11] But given the low co-occurrence that the Catch Analysis reflected, most Council members landed firmly on the decision to abolish the deep water prohibition altogether. (*See, e.g.*, June 2011 Minutes, AR Doc. 48 at 1736 (Dr. Roy Crabtree, the NMFS's Regional Administrator in the South Atlantic, noting that recent evidence "begs the question of what [] this deepwater closure [is] really doing anymore").) Ultimately, although various Council members recognized that some further protections would be needed, the Council unanimously voted to recommend elimination of the prohibition in its entirety, and to submit that proposal in the form of a regulatory amendment (Regulatory Amendment 11) to the NMFS for review and adoption. (Aug. 2011 Minutes, AR Doc. 66 at 2287-89 (roll call vote).)

2.    The NMFS Conducted Additional Co-Occurrence Research

Presented with the Council's recommendation to repeal the recently enacted six-stock deep water prohibition, the NMFS conducted additional research into co-occurrence of speckled hind and warsaw grouper with the other stocks included in the prohibition, especially the potential co-occurrence of those species with blueline tilefish. In an unrelated confluence of events, the Council's Science and Statistical Committee had proposed a twelve-fold increase in the total acceptable biological catch and optimal yield for blueline tilefish (Apr. 2012 Crabtree Mem., AR Doc. 192 at 6099), which would mean that commercial fishermen could sustainably harvest much

---

[11] For example, Alternative 2 would have removed blueline tilefish from the prohibition altogether, whereas Alternative 4 would have removed blueline tilefish from the prohibition only in the deepwater area north of Cape Hatteras. (RA 11, AR Doc. 86 at 2989). Other alternatives would have allowed limited fishing of snowy grouper in certain portions of the closed waters. (*Id.*)

more blueline tilefish than in the past, and the NMFS was concerned that the optimal yield for blueline tilefish could not be achieved if the six-stock deep water prohibition remained in place. (*Id.* at 6119 (estimating annual economic loss to the blueline tilefish fishing community); RA 11 Final Rule, AR Doc. 196 at 6119 (noting that the deep water prohibition "would result in significantly greater economic losses to a segment of commercial snapper-grouper fisheries than originally anticipated when the Council approved Amendment 17B.").) [12]

To further explore co-occurrence with blueline tilefish, the NMFS issued an exempted fishing permit ("EFP") to a select group of fishermen, allowing them to target speckled hind and warsaw grouper despite the existing prohibition. (RA 11, AR Doc. 86 at 2997, 3014; NMFS SERO presentation titled "Regulatory Amendment 11, Speckled Hind and Warsaw Grouper Catch Data" (June 14, 2011), AR Doc. 52 at 1977; *see also generally* Exempted Fishing Permit to Dr. Louis Daniel, on behalf of North Carolina Division of Marine Fisheries (Aug. 2, 2011) ("EFP"), AR Doc. 8 (letter granting and describing EFP).) The NMFS limited the EFP to the deep water areas (defined as more than 240 feet deep) north of Cape Hatters, North Carolina (EFP, AR Doc. 8 at 67), and the North Carolina Division of Marine Fisheries monitored all fishing trips and assisted in data collection, eventually creating a report that compiled all of the EFP data (*id.* at 67-68).

The EFP data mirrored the results of the Catch Analysis: it found extremely low co-occurrence between speckled hind and warsaw grouper with blueline tilefish. (*See* S.

---

[12] The NMFS estimated that the deep water prohibition would reduce annual harvests of blueline tilefish by 280,834 pounds below the optimum yield for blueline tilefish, resulting in an annual economic loss of $438,114. (RA 11 Final Rule, AR Doc. 196 at 6119).

Atl. Fishery Mgmt. Council, Summ. Minutes (Mar. 8, 2012) ("Mar. 2012 Minutes"), AR Doc. 108 at 3783-86.) Of the 73 fishing trips made pursuant to the EFP in the deep water area off the North Carolina coast, fisherman caught 94,000 pounds of blueline tilefish but not a single speckled hind or warsaw grouper. (*Id.* at 3784-3785 ("[W]ith this information here you can see that we are not seeing speckled hind and Warsaw grouper in this area, at these depths that are fished[.]"); *see also* Comments on Request for Disapproval, AR Doc. 203 at 6219 (noting the complete absence of deep water co-occurrence between speckled hind and warsaw grouper); Mar. 2012 Minutes, AR Doc. 108 at 3786 (members of the Council noting that the EFP data was "pretty compelling").)

3. <u>The NMFS Prepared An Environmental Assessment</u>

In addition to reviewing the Catch Analysis and commissioning the EFP data, the NMFS also prepared an Environmental Assessment to evaluate the environmental impact of an agency decision to lift the deep water prohibition. (RA 11, AR Doc. 86 at 2950-3040); *cf.* 42 U.S.C. § 4332. In the Environmental Assessment, which, among other things, evaluated the information presented in the Catch Analysis, the NMFS acknowledged uncertainty in the datasets used in the Catch Analysis (Final App. to RA 11, Appendix B, AR Doc. 87 at 3041-58 (noting various problems with the data)), but nonetheless found the data sufficient to show that "the probability of catching either [co-occurring] species with speckled hind and warsaw grouper is low." (RA 11, AR Doc. 86 at 2997.)

The NMFS also posited that, even though repealing the deep water prohibition "could result in the greatest level of negative biological effects as it would allow the greatest amount of fishing" overall, "with respect to speckled hind and warsaw grouper"

in particular, lifting the prohibition "could have the *greatest positive biological effect for the species*" because it could reduce fishing pressure and bycatch with respect to the *shallower* waters, where the species are most abundant, resulting in a smaller number of overall catch. (*Id.* (emphasis added).) In other words, based on the data in the Catch Analysis demonstrating that there are more speckled hind and warsaw grouper in the shallower water than deeper water, the NMFS reasoned that the deep water prohibition might be leading fishermen to fish in shallower water than they otherwise would have, and by removing the deep water prohibition, those fishermen would move to deeper water, where there are fewer specked hind and warsaw grouper to catch, so fewer speckled hind and warsaw grouper would be caught overall. (*See id.* (noting that the Council's SSC and Advisory Panel "indicated that the 240-foot (40 fathom closure) might actually increase fishing mortality of speckled hind and warsaw grouper if it resulted in a shift in fishing pressure [from the] deep water to the shelf edge (131 to 262 foot depth) where speckled hind and warsaw grouper are most abundant").)

In addition, as part of the environmental review, the NMFS prepared its own "Bycatch Practicability Analysis," which evaluated the extent to which lifting the prohibition would affect bycatch of speckled hind and warsaw grouper. (Final App. to RA 11, Appendix B, AR Doc. 87 at 3045-51.) In the Bycatch Practicability Analysis the NFMS again explained that eliminating the deep water prohibition "could reduce fishing pressure at the shelf-edge, which serves as a nursery area for speckled hind and warsaw grouper. Therefore, positive biological effects could be expected for speckled hind and warsaw through a reduction in the magnitude of bycatch[.]" (*Id.* at 3073, 3076).

Finally, the agency's Environmental Assessment also evaluated the alternatives that the Council had considered and the expected outcome of each one.  (*See* RA 11 (section titled "What Are the Biological Effects of the Proposed Alternatives on Protected Resources?"), AR Doc. 86 at 2996-3001.)  With respect to the economic effect of each alternative in particular, the NMFS concluded that, because the deep water prohibition was not actually serving any biological benefit, "any harvest reduction would be an unnecessary economic loss[,]" so lifting the deep water prohibition would have the most economic benefit.  (*Id.* at 2999.)  Furthermore, the NMFS provided an in-depth analysis of the expected social impact of each alternative on the fishing communities involved in the South Atlantic Snapper Grouper Fishery, which focused in large part on the alternatives that would allow fishermen to harvest blueline tilefish.  (*Id.* at 2999-3002.)

### 4. The NMFS Considered Public Comment

On December 20, 2011, in light of the Catch Analysis, the EFP Data, and its own Environmental Assessment, the NMFS issued a proposed rule adopting Regulatory Amendment 11.  (Regulatory Amendment 11 Proposed Rule, 76 Fed. Reg. 78,879 (Dec. 20, 2011) ("RA 11 Proposed Rule"), AR Doc. 186 at 6082-84.)  The NMFS's proposal maintained that the six-stock deep water prohibition should be lifted because the measure was an ineffective means of protecting the speckled hind and warsaw grouper, given that (1) speckled hind and warsaw grouper are "rarely encountered" in the deep water areas that the prohibition covered; (2) speckled hind and warsaw grouper rarely co-occur with the species included in the prohibition; and (3) the prohibition imposed a greater than anticipated economic hardship on fishermen.  (RA 11, AR Doc. 86 at 3006.)  Thereafter, the NMFS solicited and considered public comments on Regulatory

Amendment 11 and the proposed implementing regulations. (RA 11 Proposed Rule, AR Doc. 186; RA 11 Final Rule AR Doc. 196 at 6115-20.)

Plaintiffs submitted written comments that strenuously objected to NMFS's proposed adoption of Regulatory Amendment 11 because, according to Plaintiffs, "it would remove a measure necessary to prevent overfishing of specked hind and warsaw grouper without providing an adequate substitute." (Pls.' Mot. for Summ. J., ECF No. 32 ("Pls.' Mot.") at 22; AR Doc. 12 at 6263-80.) In their comments, Plaintiffs argued that "the Catch Analysis had concluded that these fish are more likely to occur in the deep water closure area than they are to occur in shallower waters, and that the closure was necessary to protect the mature, spawning individuals crucial to the species' recovery." (Pls.' Mot. at 22.) Plaintiffs further stated that "the proposal would violate the Magnuson-Stevens Act by eliminating the only accountability measure covering bycatch of these species, and by failing to minimize bycatch and bycatch mortality to the extent practicable." (*Id.*)

### 5. The Promulgation Of Regulatory Amendment 11

On May 10, 2012, following the notice and comment period for its Proposed Rule, the NMFS issued the final rule that repealed the six-stock deep water prohibition. (RA 11 Final Rule, AR Doc. 196 at 6120 (amending 50 C.F.R. § 622.35 (o)).) The final rule underscored the NMFS's conclusion that data analyzed or collected after Amendment 17B was passed (chiefly, the Catch Analysis, EFP Data, and Environmental Assessment) had made clear that speckled hind and warsaw grouper did not actually co-occur with the six stocks included in the deep water prohibition. (*See, e.g.*, *id.* at 6115-17 (referring the newly analyzed or newly available data).) Echoing its findings from the Environmental Assessment, the NMFS explained that, with respect to the blueline

tilefish, the "low association . . . may be attributable to the [species'] unique habitat preferences[,]" and while other species earlier thought to have co-occurred with speckled hind and warsaw grouper may share similar habitat preferences, those other species were not targeted in the Fishery, and are rarely found with speckled hind and warsaw grouper in any event. (*Id.*) Moreover, the NMFS explained in the final rule that it had concluded that repeal of the six-stock deep water prohibition "would not likely result in significant increases in the bycatch mortality of speckled hind or warsaw grouper, although low levels of bycatch of these species might occur." (*Id.* at 6117.)

The final rule also highlighted the fact that previously-implemented protection measures, including protected areas within the Fishery, seasonal closures, harvest and gear restrictions, and catch limits, still "are in effect even with the removal of the 240-ft [] prohibition[.]" (*Id.* at 6117-19.) Finally, given the NMFS's conclusion that the "prohibition is not an effective means to reduce discard mortality of speckled hind and warsaw grouper," the final rule expounded on the economic consequences of keeping versus removing the deep water prohibition, which weighed in favor of removal. (*Id.* at 6114-6115 (noting that the closure was being lifted to "reduce the socio-economic impacts to fishermen harvesting deepwater snapper-grouper"); *id.* at 6119.) The NMFS noted, in particular, that it had considered, and rejected for various reasons, ten other alternatives to lifting the prohibition. (*Id.* at 6118.)

With the publication of the final rule on May 10, 2012, Regulatory Amendment 11 went into effect immediately. (*Id.* at 6119.)

### E.    Procedural History

Nearly one month after the NMFS published the final rule implementing Regulatory Amendment 11, Plaintiffs filed the instant complaint in federal court.

31

(Compl., ECF No. 1 (June 8, 2012).)[13] Plaintiff's complaint contains three "causes of action" each of which alleges that Regulatory Amendment 11 is arbitrary and capricious and violates the Magnuson-Stevens Act in a particular way. Specifically, Plaintiffs maintain that the NMFS has unlawfully enacted a regulation that (1) fails to end overfishing of the speckled hind and warsaw grouper (*see* Compl. at ¶ 45-53 (first cause of action)); (2) fails to establish adequate annual catch limit mechanisms (*see* Compl. at ¶ 54-60 (second cause of action)); and (3) fails to minimize bycatch and bycatch mortality to the extent practicable (*see* Compl. at ¶ 61-67 (third cause of action)).

Defendants answered the complaint and filed the administrative record of Regulatory Amendment 11 on August 3, 2012. (Answer, ECF No. 22; Admin. R., ECF No. 23.) The parties later supplemented the administrative record to include certain materials from the administrative record of Amendment 17B, which they agreed were relevant to this dispute. (Defs.' Suppl. to the Admin. R., ECF No. 39; *see also* Stip. & Order, ECF No. 31 (approving the parties' agreement to supplement the administrative record to include materials from Amendment 17B).) Plaintiffs filed their motion for summary judgment on November 9, 2012 (Pls.' Mot.); Defendants' summary judgment motion followed on December 14, 2012 (Defs.' Cross-Mot. for Summ. J. ("Defs.' Mot."), ECF No. 33.).

Plaintiffs' motion for summary judgment includes two distinct sets of arguments. First, Plaintiffs argue that the undisputed administrative record demonstrates that

---

[13] Plaintiffs' standing to bring this lawsuit is not disputed. "Because this point is uncontested and other courts in this Circuit have without pause reached the merits of [these plaintiffs'] claims challenging [Fishery Management Plan Amendments] and NMFS regulations in other cases, this Court will do the same." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 107 (D.D.C. 2011); *see, e.g.*, *NRDC v. Daley*, 209 F.3d at 754; *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 151 (D.D.C. 2005).

Regulatory Amendment 11 failed to comply with the APA's standards for rulemaking. (*See* Pls.' Mot. at 26-42.)  Second, Plaintiffs attack the substance of the final rule and its attendant regulations, contending that they violate the substantive prescriptions of the Magnuson-Stevens Act.  (*See id*. at 42-54.)  In their cross-motion, Defendants contend that the NMFS's adoption of Regulatory Amendment 11 was both procedurally and substantively proper.  (*See generally* Defs.' Mot.)  The cross-motions were fully briefed as of February 8, 2013.  (*See* Pls.' Reply (filed Feb. 8, 2013).)  On April 5, 2013, the matter was transferred to this Court.  (*See* Minute Entry of Apr. 5, 2013.)  A hearing on the parties' cross-motions was held on July 30, 2013.  (*See* Minute Entry of July 30, 2013.)

## II.    LEGAL STANDARDS

Summary judgment under Federal Rule of Civil Procedure 56(c) is normally appropriate when the pleadings and the record evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, that standard does not apply to cases involving review of a final agency action undertaken pursuant to the Magnuson-Stevens Act.  Rather, "[t]he Administrative Procedure Act . . . sets forth the full extent of judicial authority to review [such] executive agency action[,]" *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citations omitted); *see also* 16 U.S.C. § 1855(f)(1)(B) (reviewing court may set aside challenged agency action taken under Magnuson-Stevens Act based only on grounds specified in 5 U.S.C. § 706(2)); *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 155 (D.D.C. 2005) (citations

omitted) ("NMFS's actions are reviewed by this Court in accordance with the judicial review provisions of the Administrative Procedure Act[.]").

A reviewing court applying section 706 of the APA must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34 (1983). Generally speaking, an agency action is not arbitrary and capricious where the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks and citation omitted). Conversely, an agency rule is considered arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Id.*; *see also N.C. Fisheries Ass'n.*, 518 F. Supp. 2d at 79.

Because "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, [ ] the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 79 (internal quotation marks and citations omitted); *see also id.* (calling summary judgment in the APA context a "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and

otherwise consistent with the APA standard of review" (citing *Richards v. INS*, 554 F.2d 1173, 1177 n.28 (D.C. Cir. 1977))). Under this deferential standard, the court's review is limited to the administrative record created by the agency, *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 160 (D.C. Cir. 2003), and the agency's decisions are entitled to a "presumption of regularity[,]" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Where there is room for disagreement, the court may not "substitute its judgment for that of the agency" and instead must only "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43; *see also Bloch v. Powell*, 348 F.3d 1060, 1070 (D.C. Cir. 2003).

Courts considering challenges to actions that an agency has taken pursuant to the Magnuson-Stevens Act owe an especially high degree of deference to the agency due to the "highly technical and scientific determinations" at issue, which are "within the agency's expertise, but are beyond the ken of most judges." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 80 (citations omitted); *see also Ctr. for Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 136 (D.D.C. 2013) (citations omitted). Accordingly, "[w]hen a party challenges a [Fishery Management Plan], [P]lan [A]mendment, or regulation . . . a court's 'task is not to review *de novo* whether the [A]mendment complies with [the Magnuson-Stevens Act] but to determine whether the [] conclusion that [the Act has] been satisfied is rational and supported by the record.'" *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 79 (quoting *C&W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1562 (D.C. Cir. 1991)); *see also Nat'l Audubon Soc'y v. Evans*, No. 99-1707, 2003 WL 23147552, at *4

(D.D.C. July 3, 2003) ("Because the agency is expected to have expertise is its area, a certain degree of deference is due, particularly on issues about which experts disagree.") (citing *Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 378 (1989)).  Thus, judicial review is "by no means a rubber stamp," *see NRDC v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), but courts should defer to the agency's expertise on matters of science or policy, *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990), and may not "second guess an agency decision or question whether the decision made was the best one."  *C&W Fish Co.*, 931 F.2d at 1565.

## III.    DISCUSSION

The parties have placed two issues before this Court in the context of their pending cross-motions for summary judgment:  first, whether the NMFS's adoption and implementation of Regulatory Amendment 11 complied with the APA's standards for rulemaking; and second, whether the substance of Regulatory Amendment 11 itself— *i.e.*, repeal of the six-stock deep water prohibition—complies with the Magnuson-Stevens Act.  For the reasons that follow, this Court answers both questions in the affirmative.

### A.    The NMFS Complied With The APA's Standards For Rulemaking In Enacting Regulatory Amendment 11

#### 1.    The Agency Reasonably And Rationally Concluded That The Six-Stock Deep Water Prohibition Was An Ineffective Conservation Measure And Thus Should Be Repealed

The administrative record in this matter clearly and unequivocally demonstrates that the NMFS "examine[d] the relevant data and articulate[d] a satisfactory explanation" for its decision to promulgate Regulatory Amendment 11.  *State Farm*, 463 U.S. at 43.  As the prior description of the agency's actions establishes, the NMFS

here not only reevaluated the Catch Analysis to determine whether and to what extent speckled hind and warsaw grouper actually co-occur with the six prohibited stocks, but it also commissioned its own deep water study of data collected from special fishing trips that were intentionally designed to target these species (on an exempted basis), and it dutifully undertook a comprehensive environmental impact analysis of the repeal proposal, including an evaluation of the how lifting the prohibition would affect the bycatch mortality of speckled hind and warsaw grouper. Although Plaintiffs vigorously attack the agency's analysis of the data and the conclusions that it drew, nothing in their summary judgment briefing establishes that the agency failed to rely on the best available scientific information regarding where the speckled hind and warsaw grouper are found and with what other species they live, or that the agency somehow neglected to bring its own expertise to bear on its consideration of whether or not the six-stock deep water prohibition was accomplishing its intended purpose. And in the absence of any such evidence, this Court is hard-pressed to conclude that the agency transgressed the requirements of the APA, especially given the significant effort that the agency expended in gathering and evaluating the available data as part of its consideration of whether or not to repeal the deep water prohibition. (*See supra* Part I.D.)

Indeed, on this record, this Court finds that the NMFS's conclusion that the six-stock deep water prohibition should be lifted was entirely rational. Under the Magnuson-Stevens Act, the NMFS has the responsibility of authorizing fishery management plans that balance concerns about the conservation of fishery resources, on the one hand, with our national interest in maximizing our fisheries' sustainable yield, on the other. It is clear to this Court that achieving that balance was precisely what the

NMFS was attempting to do when it, first, prohibited the targeting of certain deep water species that were thought to co-occur with the vulnerable and overfished speckled hind and warsaw grouper, and then, second, repealed that prohibition when experts reviewed the data and determined that speckled hind and warsaw grouper were much more likely to be found in shallow areas not covered by the prohibition, and that, in any event, there was a low incidence of co-occurrence in the deep water areas. Try as they might, Plaintiffs have done little to demonstrate that it was irrational for the agency to conclude that the prohibition should be lifted, in light of these core factual findings.

Nor can Plaintiffs credibly contend that the agency's stated explanation for its decision to lift the deep water prohibition was unsatisfactory for APA purposes. Plaintiffs insist that the the NMFS has failed to explain its change in policy regarding what conservation measures are necessary to protect the speckled hind and warsaw grouper, given that the agency expressly stated, when it enacted the prohibition in Amendment 17B, that a mere ban on landings of speckled hind and warsaw grouper "would not be sufficient to end overfishing" and therefore additional measures, such as the six-stock deep water prohibition, were required. (Pl. Mot. at 39 (internal quotation marks and citation omitted). The agency clearly has changed its position on this issue, and if Plaintiffs are confused or uncertain about the genesis of the agency's change of heart, this Court does not know why: the NMFS has repeatedly maintained that its new evaluations of the available data demonstrated that the six-stock deep water prohibition was not an effective means of addressing the overfishing problem with respect to speckled hind and warsaw grouper, and the administrative record loudly echoes the NMFS's current explanation for its change in position. (*See, e.g.*, Final App. to RA 11,

AR Doc. 87 at 3050 (concluding that speckled hind and warsaw grouper "rarely co-occurred" with the six stocks included in the deep water prohibition); June 2011 Minutes, AR Doc. 48 at 1740 (Councilmember stating that the deep water prohibition, though "well intentioned[,]" was "too broad of a brush" for the NMFS to take, and noting that he was "not convinced anymore that what [the NMFS] put in place here is meeting [its] purpose and need"); Mar. 2012 Minutes, AR Doc. 108 at 3783-3786 (noting that the exempted fishing permit data found extremely low co-occurrence between blueline tilefish and both the speckled hind and warsaw grouper); RA 11, AR Doc. 86 at 2997 (finding the data sufficient to show that "the probability of catching either [co-occurring] species with speckled hind and warsaw grouper is low"); *id*. at 3005 (noting the Scientific and Statistical Committee's conclusion that "the deepwater closure has little, or limited effect on protecting speckled hind and warsaw grouper").) The final rule for Regulatory Amendment 11 itself also reiterates the NMFS's conclusion that data analyzed or collected after Amendment 17B was passed made clear that speckled hind and warsaw grouper did not actually co-occur with the six stocks included in the deep water prohibition, so the prohibition was unlikely to be effective. (*See, e.g.*, RA 11 Final Rule, AR Doc. 196 at 6115-17 (referring the newly analyzed or newly available data).)

What is more, there is no legal basis for Plaintiffs' suggestion that, once the agency had enacted Amendment 17B, it could not change its mind and rationally lift the deep water prohibition within the relatively short period of time that elapsed between the promulgation and the repeal of that regulation. (Pl. Mot. at 1, 38-39.) It is well-established that an agency can reverse course on an issue, and that no heightened

standard applies when an agency changes its mind. *Fox*, 556 U.S. at 514. For this reason, an agency's change in position need not be based on "new data or experience[,]" *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) (internal quotation marks omitted), so long as the agency "display[s] awareness that it *is* changing position," *Fox*, 556 U.S. at 515, and provides a "reasoned explanation" for any decision to "disregard facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. Furthermore, the agency's rationale for the changed policy need not be reiterated fully in the Final Rule itself so long as the rationale may "reasonably be discerned" from the administrative record as a whole. *See Gardner v. Grandolsky*, 585 F.3d 786, 792 (3d Cir. 2009) (citing *State Farm*, 463 U.S. at 43); *Gatewood v. Outlaw*, 560 F.3d 843, 848 (8th Cir. 2009) ("When the agency has articulated and acted on a consistent rationale throughout the course of a lengthy informal rulemaking process, the final rule is not arbitrary and capricious because the rationale was not fully reiterated in the final agency action."). Thus, while the agency cannot change its mind *sub silentio*, *Fox*, 556 U.S. at 515, the agency faces a "low bar" in justifying that change, *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 377 (D.C. Cir. 2013); *see also Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 6 (D.C. Cir. 2009).

Far from remaining silent on the change that occurred in this case, the NMFS has consistently provided a reasoned basis for its decision to repeal the six-stock deep water prohibition: the Catch Analysis, the Exempted Fishing Permit data, and the Environmental Assessment all cast doubt on the agency's initial interpretation of the data such that the six-stock deep water prohibition could no longer be considered an

effective means of protecting speckled hind and warsaw grouper. And, as noted above, a rational decision by an expert agency that is seemingly supported and clearly explained is, in essence, all that the APA requires. *See Overton Park*, 401 U.S. at 416 (explaining that, when evaluating whether an agency has acted in violation of the APA's standards, a court only "consider[s] whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment[,]" and the court "is not empowered to substitute its judgment for that of the agency").

### 2. Regulatory Amendment 11 Was Not Arbitrary And Capricious

Notwithstanding the fact that the record here demonstrates that the NMFS rationally relied upon available scientific data to draw a reasonable conclusion that the deep water prohibition was an ineffective conservation measure, Plaintiffs argue that the NMFS's promulgation of Regulatory Amendment 11 was arbitrary and capricious in violation of the APA because, first, the NMFS improperly relied on factors that Congress did not intend for it to consider, namely, economic factors; second, the agency ignored the unique vulnerabilities facing speckled hind and warsaw grouper; and third, the explanation that the NMFS provided for Regulatory Amendment 11 is counter to the evidence. (Pls.' Mot. at 26.) None of these contentions holds water.

First of all, Plaintiffs are plainly wrong to suggest that the NMFS's consideration of economic factors amounted to a reliance on factors that Congress did not intend the NMFS to consider. [14] The Magnuson-Stevens Act explicitly allows the NMFS to

---

[14] Plaintiffs do not specifically argue that the NMFS's action was arbitrary and capricious on this ground, but in their substantive challenge to the Magnuson-Stevens Act requirements, Plaintiffs do contend that the NMFS improperly considered the socio-economic impact of keeping or lifting the six-

consider economic factors: National Standard 8 specifically directs the NMFS to minimize adverse economic impacts "to the extent practicable" and "consistent with the conservation requirements" of the Act. *See* 16 U.S.C. § 1851 (a)(8). To be sure, under this statutory scheme, NMFS may not rely on economic considerations when choosing a conservation measure if one conservation measure is clearly better adapted to prevent overfishing than another, less costly measure. *See Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 121 (D.D.C. 2011) (citation omitted). But "when two different plans achieve similar conservation measures[,]" the NMFS may "take[] into consideration adverse economic consequences[.]" *NRDC v. Daley*, 209 F.3d at 753; *see also* 50 C.F.R. § 600.345(b)(l). Thus, while the Magnuson-Stevens Act requires the NMFS to prioritize conservation measures in all instances, the statute also requires the NMFS to consider the socio-economic impact of fishery management tools, all other things being equal. *See* 16 U.S.C. § 1851(a)(8).

Here, the NMFS considered certain economic factors in adopting Regulatory Amendment 11; for example, in its Environmental Assessment, the NMFS concluded that lifting the deep water prohibition would have the most economic benefit, engaging in an in-depth analysis of the expected social impact of each alternative on the fishing communities involved in the South Atlantic Snapper Grouper Fishery, which focused in large part on which alternatives would allow fishermen to harvest blueline tilefish. (RA 11, AR Doc. 86 at 2999-3002.) Likewise, in the Final Rule adopting Regulatory

---

stock deep water prohibition. *See* Section III.B.1, *infra.* (*See* Pls.' Mot. at 43 (arguing that the NMFS's improperly allowed economic considerations to affect their analysis.).) This argument can also be characterized as the contention that the NMFS was "improperly relying" on socio-economic considerations when it enacted Regulatory Amendment 11 in violation of the APA; therefore, this Court will address the 'improper economic factor' argument here as well.

Amendment 11, the NMFS expounded on the economic consequences of keeping versus removing the deep water prohibition, which weighed in favor of removal. (RA 11 Final Rule, AR Doc. 196 at 6114-15 (noting that the NMFS was removing the closure to "reduce the socio-economic impacts to fishermen harvesting deepwater snapper-grouper"); *id*. at 6119.) These considerations were not at all improper because the NMFS had already determined that keeping or removing the prohibition would have similar effects on the conservation of speckled hind and warsaw grouper. In other words, the record reveals that the NMFS reached the economic analysis in the Environmental Assessment only after noting that the deep water prohibition was not actually serving a biological benefit by reducing bycatch in a meaningful way, and consequently, "any harvest reduction would be an unnecessary economic loss." (RA 11, AR Doc. 86 at 2999.) Similarly, in the Final Rule, the NMFS first concluded that the six-stock deep water "prohibition is not an effective means to reduce discard mortality of speckled hind and warsaw grouper," before discussing the economic benefits of removing the prohibition. (RA 11 Final Rule, AR Doc. 196 at 6115.) In short, because it is clear beyond cavil that the NMFS may take into consideration adverse economic consequences when two different plans achieve similar conservation measures, *see NRDC v. Daley*, 209 F.3d at 753, 50 C.F.R. § 600.345(b)(l), the NMFS's adoption of Regulatory Amendment 11 was not arbitrary and capricious on the ground that it relied on a factor that Congress did not intend it to consider.

Plaintiff's contention that the NMFS ignored the unique vulnerabilities of the speckled hind and warsaw grouper likewise misses the mark in light of the instant administrative record. (*See* Pls.' Mot. at 26 (contending that the NMFS acted arbitrarily

and capriciously by "entirely fail[ing] to consider the unique characteristics of speckled hind and warsaw grouper that made the deepwater closure critical to protecting them from overfishing"); *id.* at 27 (noting that the overlooked, unique characteristics are the facts that speckled hind and warsaw grouper move from shallower to deeper water as they age, change sex from female to male as they grow, spawn in large groups, and are likely to die when caught in deep water due to barotrauma); *id.* at 28-29 (emphasizing the absence of references to these unique vulnerabilities of speckled hind and warsaw grouper in the final rule for Regulatory Amendment 11)). Although a reviewing court must certainly find that an agency rule is arbitrary and capricious for APA purposes if the agency "entirely failed to consider an important aspect of the problem[,]" *State Farm*, 463 U.S. at 43, any assertion that the NMFS did not take into account the particular characteristics of the speckled hind and warsaw grouper that make them vulnerable to overfishing when it enacted Regulatory Amendment 11 is entirely baseless, when the record in this matter is fully and carefully considered. *See In Re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 634 (8th Cir. 2005) (noting that "there is no requirement that every detail of the agency's decision be stated expressly in the" final rule, so long as the "rationale is present in the administrative record underlying the document") (citations omitted).

As the NMFS points out, the administrative record for Regulatory Amendment 11 is replete with references to the unusual biological characteristics of speckled hind and warsaw grouper. (Defs.' Mot. at 20.) The Council discussed this information when it drafted Regulatory Amendment 11 (*see, e.g.*, RA 11, AR Doc. 86 at 2959; June 2011 Minutes, AR Doc. 48 at 1726; Final App. to RA 11, AR Doc. 87 at 3057-58), and the

NMFS considered these characteristics again when it reviewed the Council's proposal (RA 11, AR Doc. 86 at 2959 ("Both speckled hind and warsaw grouper are extremely vulnerable to overfishing because they are slow growing, long-lived, and change sex from female to male with increasing size and age."); *see also* June 2011 Minutes, AR Doc. 48 at 1731).). Including this information in the Environmental Assessment alone would have been sufficient to overcome an APA attack on this basis, but the NMFS *also* discussed the unique characteristics of the speckled hind and warsaw grouper in the Final Rule itself. (*See* RA 11 Final Rule, AR Doc. 196 at 6118.). And it must not be forgotten that the agency's initial decision to adopt the six-stock deep water prohibition was nearly exclusively premised on its understanding of the speckled hind and warsaw grouper as particularly vulnerable stocks of fish—a conclusion that did not change from December of 2010, when the NMFS published the Final Rule implementing Amendment 17B, to May of 2012, when it passed Regulatory Amendment 11. (*See* Pls.' Mot. at 27-28.) Instead, "[w]hat *did* change was NMFS's assessment of the *effectiveness* of Amendment 17B's deep water prohibition in addressing those vulnerabilities, and that change was appropriately the focus of NMFS's analysis in the final rule for Regulatory Amendment 11." (Defs.' Mot. at 20 (emphasis in original) (record citation omitted).) Considering the record as a whole, this Court concludes that the NMFS adequately considered the characteristics that make the speckled hind and warsaw grouper particularly susceptible to bycatch mortality when it adopted Regulatory Amendment 11, and therefore, the NMFS's adoption and implementation of Regulatory Amendment 11 was not arbitrary and capricious on the ground that the NMFS failed to consider this important aspect of the problem.

Finally, this Court also disagrees with Plaintiffs' assertion that the NMFS's explanation for its change of policy runs counter to the evidence. (Pls.' Reply at 20-21.) Plaintiff's argument in this regard boils down to the argument that the NMFS misunderstood the Catch Analysis and therefore came to the wrong conclusion about what conservation measures were required to protect the speckled hind and warsaw grouper. Plaintiffs devote a substantial portion of their summary judgment brief to a veritable exegesis of the data in the Catch Analysis, arguing that the Catch Analysis data actually establishes that speckled hind and warsaw grouper are more likely to be caught in deep water areas; that speckled hind and warsaw grouper do, in fact, co-occur with the other six species that the prohibition protected; and that the prohibition was an effective and necessary conservation tool. (*Id.*) And the Defendants take the bait, responding by pointing to statistics to support their contention that the NMFS "rationally determined that the closure was 'not an effective means to reduce discard mortality'" because new studies—including data reviewed in the Catch Analysis and the EFP—invalidated the assumption on which the prohibition rested: that speckled hind and warsaw grouper frequently co-occur with the six stocks. (Defs.' Mot. at 21 (citing RA 11 Final Rule, AR Doc. 196 at 6117).)

This Court concludes that, because "[t]he proper function of the court is not to weigh the evidence anew and make technical judgments," *Am. Petrol. Inst. v. Castle*, 665 F.2d 1176, 1185 (D.C. Cir. 1981), Defendants need not have entangled themselves in the net that Plaintiffs have cast down on the issue of who has the better statistical interpretation. It is sufficient that the NMFS interpreted statistical information presented in the Catch Analysis and evaluated co-occurrence data in the Bycatch

Practicability Analysis in a seemingly rational way, because the interpretation of data and the application of statistics to fishery management are precisely the type of "highly technical and scientific determinations" that fall "within the agency's expertise, but [are] beyond the ken of most judges." *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 80 (citations omitted); *lnt'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) ("The rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise[.]'"). The deference that is owed to an agency's interpretations of statistics and information in its area of expertise is incontrovertible; "[i]n other words, when an agency talks scientific data, courts listen [, and a]s long as the ultimate decision is reasonable and reasonably explained, that decision will stand." *Oceana, Inc. v. Pritzker*, No. 13-770, 2014 WL 616599 (D.D.C. Feb. 18, 2014).

As has already been discussed, a review of the record as a whole reveals that the NMFS's interpretation of the data it reviewed was imminently reasonable. Moreover, Plaintiff's particular examples of the agency's purportedly incorrect assumptions and conclusions are easily dispensed with. For example, although it is true that the Catch Analysis found that "the odds of encountering speckled hind and warsaw grouper are higher outside of 240 ft" (Final App. to RA 11, AR Doc. 87 at 3048; *see also* Pls.' Mot. at 20-22 (arguing that the agency mistakenly viewed this fact as supporting Regulatory Amendment 11)), the statement that the general odds of finding speckled hind and warsaw grouper are higher in deep water does not indicate that the odds of finding speckled hind and warsaw grouper *along with one of the six species included in the prohibition* are also higher in deeper water. Similarly, the fact "the vast majority of the

data analyzed in the Catch Analysis came from fishing trips that occurred at shallow depths" (Pls.' Mot. at 33; *see also id.* at 32 (highlighting the statement in the Catch Analysis that the results of the co-occurrence analysis "could have been biased because relatively little data was available beyond 240 feet") (citation omitted)), does not doom the NMFS's methodology—which rightly recognized these flaws (*see* Final App. to RA 11, AR Doc. 87 at 3046-3047, 3056.)—nor does it prevent reliance on that data. *Cf. Ctr. for Biological Diversity*, 933 F. Supp. 2d at150 (noting that "'[i]t is well settled . . . that the Secretary can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed'") (quoting *Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106, 115 (3d Cir. 2011) (alteration in original); *Nat'l Coal. For Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 129 (D.D.C. 2002) ("A court cannot require NMFS to obtain better data.").

It also bears repeating that the NMFS did not end its co-occurrence inquiry with the Catch Analysis; it went further (*see* Mar. 2012 Minutes*, AR Doc. 108 at 3783-3786; *see also supra* Part I.D.2 (explaining that the NMFS additionally reviewed the Exempted Fishing Permit data, which corroborated the low co-occurrence findings)); and the agency ultimately attributed the consistent low co-occurrence findings to a reasonable belief that the species at issue have different habitat preferences (*see* RA 11, AR Doc. 86 at 2996; Final App. to RA 11, AR Doc. 87 at 3051-3052, 3057;  June 2011 Minutes, AR Doc. 48 at 1730-1731).  Plaintiffs do not to point to any record evidence showing actual co-occurrence of speckled hind or warsaw grouper with the six-stocks of fish that are the subject of the prohibition in deep water areas of the Fishery or

otherwise undermining the agency's finding of fact regarding co-occurrence, and it goes without saying that an agency's explanation for a rule cannot run counter to evidence that does not exist.[15] Notably, Plaintiffs' contention that the NMFS has misinterpreted the data would be unavailing even if there was a substantial disagreement among the experts regarding the scientific data (there is not), because "deference is due" to the NMFS "particularly on issues about which experts disagree." *Nat'l Audubon Soc'y*, 2003 WL 23147552, at *4 (citing *Marsh*, 490 U.S. at 378)). Given the NMFS's reasonable interpretations of the Catch Analysis, the Exempted Fishing Permit data, and the Environmental Assessment, it was well within the NMFS's discretion to conclude that the six-stock deep water prohibition was ineffective and thus that it should be repealed in its entirety; consequently, the NMFS's adoption of Regulatory Amendment 11 was not arbitrary and capricious on the grounds that it ran contrary to the evidence.

In sum, this Court concludes that the NMFS did not violate the APA in enacting Regulatory Amendment 11, inasmuch as the agency reasonably and rationally determined that speckled hind and warsaw grouper do not actually co-occur with the

---

[15] In fact, based on the data in the Catch Analysis, the Exempted Fishing Permit data, and its own Environmental Assessment, the NMFS's experts almost uniformly concluded that the deep water prohibition was ineffective. Indeed, even those experts who expressed concern over repealing the prohibition did not object to doing so; they simply acknowledged the fact that it was still necessary to find an effective conservation measure to implement moving forward. (*See, e.g.*, June 2011 Minutes, AR Doc. 48 at 1736; Aug. 2011 Minutes, AR Doc. 66 at 2286.) For example, Plaintiffs repeatedly cite and quote from an email from Dr. Erik Williams, a Supervisory Research Fishery Biologist at the NMFS's Southeast Fishery Science Center, in support of their contention that members of the NMFS objected to the closure. (*See* Pls.' Mot. at 21, 32, 36 n. 3, 46, E-mail from Erik H. Williams, Ph.D., Supervisory Research Fishery Biologist, SFSC, to Tom Jamir ("Williams Email") (Oct. 26, 2011), AR at 8453.). But, Plaintiffs' reliance on this document is misplaced. It is true that, with the caveat that he was "backlogged" with other reviews, Dr. Williams provided "quick comments" in which he concluded that, without a "new assessment" into the locations where speckled hind and warsaw grouper actually dwell, "there does not seem to be scientific justification for opening up the closure." (Williams Email, AR at 8453.) However, in the very same paragraph, Dr. Williams also stated that, while "[s]cience does not support opening the deepwater up to fishing, [] science also cannot answer the question of how much of an impact the closure has had on speckled hind and Warsaw (sic) in the first place. So, this is a tough situation." Moreover, in the end, Williams *did not oppose* lifting the deep water prohibition. (*Id.* ("I do not have any recommendation[.]").)

other six species in the deep water area that the closure affected, so that a continued prohibition on targeting those species in that area was an ineffective means of protection. The NMFS's conclusion that the low co-occurrence rendered the prohibition ineffective appears throughout the administrative record—from the Catch Analysis, to administrative meeting minutes, to the NMFS's Environmental Assessment—and, eventually, appears in the Final Rule itself. (*See, e.g.*, Final App. to RA 11, AR Doc. 87 at 3050-58; Mar. 2012 Minutes, AR Doc. 108 at 2783-86; RA 11, AR Doc. 86 at 2950-3035; Regulatory Amendment 11 Final Rule, 77 Fed. Reg. 27,374 (May 10, 2012), AR Doc. 196 at 114-6120.) Particularly in light of the high deference owed to the NMFS to make "highly technical and scientific determinations" involving fishery management, *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 80 (citations omitted), this Court is persuaded that the NMFS's interpretation was reasonable, that the agency considered the appropriate factors, and its rationale was sufficiently explained. *See State Farm*, 463 U.S. at 43. Consequently, the APA's rulemaking standards were satisfied.

### B. Regulatory Amendment 11 Is Otherwise Consistent With The Magnuson-Stevens Act

Plaintiffs also maintain that Regulatory Amendment 11 fails to comply with certain substantive provisions of the Magnuson-Stevens Act. Specifically, Plaintiffs maintain that the repeal of the six-stock deep water prohibition violates two of the Magnuson-Stevens Act's national standards—National Standards One and Nine—as well as 16 U.S.C. § 1853(a), a provision that sets forth specific requirements for fishery management plans.

In evaluating claims of this nature, the vast majority of district judges in this jurisdiction apply the "arbitrary and capricious" standard of review that the Supreme Court endorses in its *State Farm* case, 463 U.S. 29 (1983). *See, e.g.*, *Conservation Law Found v. Pritzker*, No. 13-821, 2014 WL 1338596, at *4, 7 (D.D.C. Apr. 4, 2014); *Oceana v. Pritzker*, 2014 WL 616599, at *4; *Ctr. For Biological Diversity v*, 933 F. Supp. 2d at 135. This Court sees no reason to depart from this practice here.[16] Thus, this Court will uphold Regulatory Amendment 11 as consistent with the Magnuson-Stevens Act so long as the National Marine Fisheries Service had a rational basis for the regulation, giving a high degree of deference to the agency in light of the scientific and technical nature of fishery management. *See, e.g.*, *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d at 157 ("Courts defer to NMFS decisions that are supported in the record and reflect reasoned decision making"); *Ctr. for Biological Diversity*, 933 F. Supp. 2d at 141 (reiterating that the Court's task is simply to determine whether the Fisheries Service's conclusion was rational and supported by the record); *see also Lovgren*, 701 F.3d at 32 (same). Important factors include whether or not the agency weighed the costs and benefits of its decision; what the public comments said regarding the final decision; and what types of research went into the implementation of the

---

[16] The Court does note, however, that there is some ambiguity regarding the proper standard of review with respect to claims of this nature. In a few cases from this jurisdiction that have arisen under the Magnuson-Stevens Act under similar circumstances, the court has applied the two-step process the Supreme Court dictated in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), rather than *State Farm*'s arbitrary and capricious standard. *See, e.g.*, *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36 (D.D.C. 2008); *Oceana v. Locke*, 831 F. Supp. 2d at 106. Moreover, at least one commentator has argued that no deference at all should be given to NMFS actions adopting or changing Fishery Management Plans that have been put forward by a Regional Council. *See* Kate Stanford, Note, *The Need for Chevron Step Zero in Judicial Review of Interpretations Developed by Fishery Management Councils*, 19 N.Y.U. Envtl. L.J. 380 (2012). There has been no prolonged discussion of the appropriate standard of review for Magnuson-Stevens Act challenges in any of the cases this Court has found, and the parties here do not raise the issue. Therefore, this Court sees no reason to move beyond the prevailing *State Farm* standard.

decision. *See, e.g.*, *Ctr. for Biological Diversity*, 933 F. Supp. 2d at 140-41 (weighing the costs and benefits of a final rulemaking, in addition to the comments to the rule, and the scientific research that the Agency relied on to "conclude[] that the Administrative Record rationally support[ed] the Fisheries Service's determination").

1. Regulatory Amendment 11 Complies With National Standard One

National Standard One requires that "[c]onservation and management measures *shall prevent overfishing* while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(l) (emphasis added). Plaintiffs argue that Regulatory Amendment 11 violates this standard because the NMFS mistakenly failed to prioritize conservation goals over other competing interests and gave undue weight to the deep water prohibition's impact on the optimum yield for blueline tilefish and the economic impact of the deep water prohibition on fishing communities. (*See id.* at 42-46.) However, this Court concludes that *Plaintiffs*—not the agency—misapprehend what the Magnuson-Stevens Act requires.

It is clear beyond cavil that the Magnuson-Stevens Act does not direct the NMFS to consider minimizing overfishing *exclusively*, nor does it require the agency to prioritize that factor to the exclusion of all other considerations. Instead, National Standard One requires Fishery Management Plans to prevent overfishing *while achieving the optimum yield from each fishery*. 16 U.S.C. § 1851(a)(l). Indeed, "[h]ad Congress charged the Secretary with merely preventing overfishing, the Secretary likely would have responded with eliminating fishing altogether." *W. Sea Fishing Co. v. Locke*, 722 F. Supp. 2d 126, 140 (D. Mass. 2010). And given that "[c]ompliance with the national standards requires balancing by the agency and the exercise of discretion

and judgment," *Lovgren*, 701 F. 3d at 32, the NMFS did not run afoul of the Act when it considered whether lifting the prohibition was necessary to achieve the optimum yield with respect to the blueline tilefish. *See* 16 U.S.C. § 1851(a)(l); *Lovgren*, 701 F.3d at 33-34.

Plaintiff is also off base to suggest that NMFS's consideration of the economic impact of maintaining the six-stock deep water prohibition was out of bounds as far as the Magnuson-Stevens Act is concerned. (*See* Pls.' Mot. at 43)  Courts in this district have long read National Standard Eight to mean that "where two alternatives in fact achieve similar conservation goals, the preferred option will be the alternative that provides the greater potential for sustained participation of fishing communities and that minimizes adverse economic impacts." *N.C. Fisheries*, 518 F. Supp. 2d at 92; *see also NRDC v. Daley*, 209 F.3d at 753 (pointing out that National Standard 8 likewise provides that the NMFS can consider a fishery management plan's economic impact on fishing communities, but "only when [the] two different plans achieve similar conservation measures[.]").  Because the NMFS concluded that the two alternatives available in this case (deep water prohibition or no deep water prohibition) would have similar conservation effects—*i.e.*, neither would be effective in preventing overfishing of speckled hind and warsaw grouper—it properly considered the socio-economic impacts of both options.

Plaintiffs also argue that Regulatory Amendment 11 violates National Standard One because it fails to *prevent* overfishing.  (Pls.' Mot. at 46-47.)  However, as the NMFS responds, Plaintiffs do not, and cannot, prove the "essential point" on which their argument relies:  that retaining the six-stock deep water prohibition "will prevent

overfishing whereas [lifting the prohibition] will not." *Blue Ocean Institute v.*
*Gutierrez*, 585 F. Supp. 2d 36, 45-46 (D.D.C. 2008). That is, the NMFS cannot be
faulted for removing or rejecting a measure that the NMFS reasonably believes will not
meet its stated purpose.

      *Blue Ocean Institute v. Gutierrez*, 585 F. Supp. 2d 36, illustrates this point.
There, the plaintiffs had tried and failed to convince the NMFS to close certain Gulf of
Mexico waters to protect the spawning areas of Western Atlantic Bluefin Tunas. *Id.* at
40. Although the parties agreed that Western Atlantic Bluefin Tunas were undergoing
overfishing, the NMFS rejected the plaintiffs' proposed closure because the NMFS
concluded that the closure would cause a redistribution of fishing efforts that would
likely increase bycatch of other species and possibly increase bycatch of Western
Atlantic Bluefin Tuna. *Id.* at 40-41. The NMFS decided to preserve the status quo
rather than adopting any other measures in lieu of the closure. *Id.* at 41. The court in
*Blue Ocean Institute* held that, even though no additional conservation measure to
prevent continued overfishing of Western Atlantic Bluefin Tuna had been enacted, the
NMFS was not required to implement a closure when the NMFS reasonably believed
that doing so would not help to prevent overfishing. *Id.*at 45-46.

      So it is here. Because the Service rationally concluded that the six-stock deep
water prohibition was not effective, its removal—even absent any replacement
measures—was not inconsistent with National Standard One. Put another way,
although National Standard One does require that the NMFS implement measures that
prevent overfishing, nothing in the standard requires the NMFS to keep in place a

measure that *fails* to prevent overfishing, especially when that measure might cause undue economic harm to the fishing community.

2. Regulatory Amendment 11 Complies With National Standard Nine

Next, Plaintiffs contend that Regulatory Amendment 11 does not comply with National Standard Nine's mandate that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9). Congress purposefully inserted the notion of practicability into this statutory standard, precisely because "[t]he priority under this standard is first to avoid catching bycatch species where practicable." 50 C.F.R. § 600.350(d). "Inconvenience is not an excuse; bycatch must be avoided as much as practicable, and bycatch mortality must be reduced until further reductions are not practicable." Magnuson-Stevens Act Provisions, National Standard Guidelines, 63 Fed. Reg. 24,212, 24,224 (May 1, 1998). At the same time, practicability means more than mere possibility; "by using the term 'practicable' Congress intended . . . to allow for the application of agency expertise and discretion in determining how best to manage fishery resources." *Conservation Law Found. v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004); *see also Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d at 158-59. In light of this framework, this Court finds that the NMFS must consider bycatch mortality in order to comply with National Standard Nine, but that the NMFS is not required to adopt every measure that could conceivably reduce bycatch.

A comparison of two cases addressing National Standard Nine's requirements is instructive. In *Conservation Law Foundation v. Evans*, the plaintiffs challenged the NMFS's adoption of a rule that made several changes to restrictions on sea scallop fisheries in the Atlantic Sea Scallop fishery management plan but did not implement a

closure, on the grounds that the NMFS violated National Standard Nine by failing to prevent bycatch to the extent practicable. 360 F.3d at 27-28. The First Circuit disagreed, finding that the desired closures could not be viewed "in isolation, discounting numerous other restrictions" that the NMFS had already imposed on the fishery. *Id*. at 28. The panel also emphasized that fishery management decisions are subject to the NMFS's discretion, noting that "[i]t is not [the court's] role to second guess [the NMFS's] determinations." *Id.* (citation omitted).

The result in *Conservation Law Foundation* stands in stark contrast to the outcome of *Flaherty v. Bryson*, 850 F. Supp. 2d 38, where the NMFS adopted and implemented an amendment to the Atlantic Herring fishery management plan without everonce mentioning whether the affected conservation measures would operate to reduce bycatch. *See id.* at 58-59 (noting that language of the challenged Amendment to the Fishery Management Plan "makes it clear that neither the Council nor NMFS made any effort to consider whether bycatch was minimized" and did "not reflect any examination or consideration" of whether the Amendment reduced bycatch). And it was the fact that the agency had not even attempted to determine whether the challenged Amendment comported with National Standard Nine that motivated the court to conclude "Defendants' approval of [the Amendment], without addressing the minimization of bycatch to the extent practicable, was in violation of the [Magnuson-Stevens Act] and APA." *Id.* at 59.

The instant record establishes that reduction in bycatch was the focus of the NMFS's research and review of Regulatory Amendment 11. The NMFS repeatedly concluded that the prohibition was *not* an effective means of preventing bycatch and

bycatch mortality, primarily because the speckled hind and warsaw grouper did not actually co-occur with the six stocks of fish that were the subject of the prohibition. (*See, e.g.*, RA 11, AR Doc. 86 at 3006; RA 11 Final Rule, AR Doc. 196 at 6114-20.) Moreover, as *Conservation Law Foundation* makes clear, the NMFS's decision to remove the deep water prohibition cannot be viewed in "isolation" and instead must be considered alongside the many other conservation measures in place to help prevent bycatch of speckled hind and warsaw grouper. *See Conservation Law Found. v. Evans*, 360 F.3d at 28. (*See also* Apr. 2012 Crabtree Mem., AR Doc. 192 at 6116-6118; 17B Final Rule, AR Doc. 5 at 50 (noting that the prohibition of harvest and possession of speckled hind and warsaw grouper is an accountability measure); Am. 17B Envtl. Assessment, 17B AR Doc. 195 at 14018 (noting that "[s]etting the [annual catch limit] at zero would prohibit all directed harvest and eliminate the need to track discards in order to implement an [accountability measure]").)

Finally, far from overlooking Regulatory Amendment 11's effect on bycatch, the record establishes that the NMFS paid close attention to this issue; indeed, the agency conducted a Bycatch Practicability Analysis and concluded that "positive biological effects could be expected . . . through a reduction in the magnitude of bycatch" as a result of *lifting* the deep water prohibition. (Final App. to RA 11, AR Doc. 87 at 3073, 3076; RA 11, AR Doc. 86 at 2996, 2997; April 2011 Minutes, AR Doc. 125 at 4745; S. Atl. Fishery Mgmt. Council, Snapper Grouper Comm., Summary Minutes (Apr. 13-14, 2011) ("Apr. 2011 Minutes"), AR Doc. 42 at 1553, 1556.) Thus, not only did the NMFS conclude that the prohibition itself was ineffective at reducing bycatch, it was the considered finding of the agency that removing the prohibition might actually help

alleviate the bycatch problem.  As a result, there is no basis in fact or law for the

Plaintiff's contention that Regulatory Amendment 11 is inconsistent with National

Standard Nine.

3.    <u>Regulatory Amendment 11 Complies With Mandatory</u><br><u>Accountability Measures Under Section 1853(a)(15)</u>

Plaintiffs' final contention is that Regulatory Amendment 11 fails to comply

with section 1853(a)(15) of the Magnuson-Stevens Act, which requires that all fishery

management plans "establish a mechanism for specifying annual catch limits . . .

including measures to ensure accountability."  (Pls.' Mot. at 47.)  When a fishery

management plan includes an "accountability" measure, the plan is supposed to

"describe" the measure, explain how it is "triggered[,]" and identify the type of data

that will support its use.  50 C.F.R. § 600.310(h)(l)(iii).  Neither the Magnuson-Stevens

Act nor the NMFS's attendant regulations indicate what types of "measures to ensure

accountability" are required in a given fishery management plan, but applicable

regulations provide that a fishery closure is one type of measure that can be included in

a fishery management plan to hold fishermen accountable to an annual catch limit if the

NMFS "determines, based on data that it deems sufficiently reliable, that . . . closure of

the fishery is necessary to prevent overfishing."  50 C.F.R. §  600.310(g)(2).

Although the parties disagree about whether the six-stock deep water prohibition

does qualifies as an accountability measure under the statute, this Court need not

resolve that dispute because whether or not the prohibition is technically an

"accountability measure," it is certainly not the *only* such measure available and in

place to address overfishing concerns related to the speckled hind and warsaw grouper.

(*See* Apr. 2012 Crabtree Mem., AR Doc. 192 at 6097-6104.)  As the NMFS points out,

other accountability measures that remain in place include the complete prohibition of the harvest and possession of all speckled hind and warsaw grouper in the South Atlantic; the creation of marine protected areas to prohibit snapper and grouper fishing entirely in certain areas of the fishery; and the enactment of gear restrictions designed to reduce bycatch mortality.  (RA 11 Final Rule, AR Doc. 196 at 6116-6119; RA 11, AR Doc. 86 at 2992-93; Final App. to RA 11, AR Doc. 87 at 3072-73.)

There is also prospective language in Regulatory Amendment 11 that indicates the NMFS's intention to implement additional conservation measures in the future in order to protect speckled hind and warsaw grouper.  (Pls.' Mot. at 50; Pls.' Reply at 24.)  To be sure, a "future plan to comply with the [Magnuson-Stevens Act] will not save an otherwise deficient [Fishery Management Plan]."  *Oceana v. Locke*, 831 F. Supp. 2d at 122 (rejecting an Fishery Management Plan Amendment as arbitrary and capricious because it was not in compliance with the Magnuson-Stevens Act and was premised on the "NMFS's suggestion that it *intends* to expand accountability measures . . . in a *future* . . . rulemaking") (emphasis in original); *see also Conservation Law Found. v. Evans*, 209 F. Supp. 2d at 9-10 (rejecting the defendants' claim that an fishery management plan amendment could pass Magnuson-Stevens Act muster based on the NMFS's plan to implement a forthcoming amendment that would comply with the Magnuson-Stevens Act).  But this is not a case in which the NMFS is premising the rejection or removal of an *otherwise effective* accountability measure on the potential future adoption of other measures.  Rather, Regulatory Amendment 11 survives Plaintiffs' challenge based on the NMFS's rational conclusion that the deep water

prohibition does not prevent overfishing of speckled hind and warsaw grouper and thus need not be retained.

Because the Magnuson-Stevens Act does not oblige the NMFS to keep in place an ineffective conservation measure, the NMFS's removal of the six-stock deepwater prohibition was not inconsistent with the purpose of the Magnuson-Stevens Act or its tenets. This Court concludes that summary judgment in Defendants' favor should be entered on the counts of Plaintiffs' complaint that maintain otherwise.

## III.   CONCLUSION

All of the challenges to Regulatory Amendment 11 that Plaintiffs float in the context of the instant action founder on the shoals of the same scientific fact: that, according to the NMFS, the speckled hind and warsaw grouper do not actually co-occur with the six stocks of fish that were included in the deep water prohibition. This realization led the NMFS to the reasonable conclusion that the six-stock deep water prohibition was an ineffective means of minimizing bycatch of speckled hind and warsaw grouper, and before removing that prohibition, the NMFS considered available scientific evidence, applied the tests and factors set forth in the Magnuson-Stevens Act, and thoroughly explained its rationale. Nothing in Plaintiffs' briefs or oral argument in this matter convinces this Court that the NMFS either transgressed the APA's standards for rulemaking or violated any standard of the Magnuson-Stevens Act, especially given the deference that is due to agency decision making in a highly technical and specialized area such as this one. Based on the administrative record, this Court is persuaded that the NMFS was permitted to repeal the deep water prohibition as a matter of law, and that the agency did so in a manner that was not arbitrary, capricious, or

inconsistent with the Magnuson-Stevens Act. Consequently, Plaintiffs' motion for summary judgment is **DENIED** and Defendants' cross-motion for summary judgment is **GRANTED**.

DATE: October 14, 2014

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge